**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ROCHESTER DRUG CO-OPERATIVE, INC., on behalf of itself and all others similarly situated,<br>　　　　Plaintiff,<br>　　　　　　v.<br><br>NOVARTIS PHARMACEUTICALS CORPORATION, NOVARTIS AG, NOVARTIS CORPORATION, ENDO PHARMACEUTICALS, INC., ENDO INTERNATIONAL PLC, and PAR PHARMACEUTICAL, INC.,<br>　　　　Defendants. | Civil Action No. 18-cv-5708<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Rochester Drug Co-Operative, Inc., maintaining its principal place of business at the address set forth in paragraph 17, on behalf of itself and all others similarly situated, for its Complaint against Defendants Novartis Pharmaceuticals Corporation, Novartis AG, and Novartis Corporation (collectively, "Novartis"); and Endo Pharmaceuticals, Inc., Endo International plc, and Par Pharmaceutical, Inc. (collectively, "Par") (the term "Defendants" refers to Novartis and Par collectively), allege as follows based on: (a) personal knowledge; (b) the investigations of counsel; and (c) information and belief.

**NATURE OF THE ACTION**

1.　　This antitrust action challenges Defendants' anticompetitive conduct that delayed generic competition in the United States and its territories for Exforge® ("Exforge"), an FDA-approved prescription drug product for the treatment of hypertension comprising the active ingredients amlodipine and valsartan. Plaintiff seeks overcharge damages arising out of Novartis's unlawful agreement with Par not to compete in the market for Exforge and corresponding AB-

- 1 -

rated generic drug products.

2.     Prior to the market entry of generic equivalents of Exforge, Novartis's U.S. sales of branded Exforge exceeded $400 million annually.

3.     Generic manufacturers Par and Synthon Pharmaceuticals Inc. ("Synthon") recognized the huge market potential for Exforge and, in or about October and November, 2007, became the first generic drug makers to file ANDAs with the FDA seeking approval to market generic amlodipine and valsartan tablets, with Exforge as their Reference Listed Drug. Par was the first to file an ANDA for the 10/160, 5/160 and 10/320 milligram strengths of amlodipine and valsartan, respectively, while Synthon was the first to file an ANDA for the 5/320 milligram strength. On information and belief, in their ANDAs, Par and Synthon addressed the three Novartis patents listed in the FDA Orange Book for Exforge by indicating that: (1) they would not seek final FDA approval until the September 21, 2012 expiration of exclusivities associated with U.S. Patent No. 5,399,578 ("the '578 Patent"), which covered the active ingredient valsartan; but (2) they would seek final FDA approval to market, and intended to launch, their ANDA products prior to the expiration of the follow-on patents, U.S. Patent Nos. 6,294,197 ("the '197 Patent") and 6,395,728 (the '728 Patent), which they claimed were invalid and/or would not be infringed by Par's and Synthon's proposed generic equivalents.

4.     On November 30, 2011, Par entered into an asset purchase agreement with Synthon under which Par would acquire Synthon's ANDA for a generic version of Exforge (5 mg/320 mg and 10 mg/320 mg of amlodipine and valsartan, respectively). On December 30, 2011, Par closed on this asset purchase agreement.

5.     On information and belief, in or around 2011 and following receipt of notice of Par's ANDA containing challenges to the '197 and '728 Patents, Par and Novartis reached an

agreement (the "Agreement") under which (1) Par agreed not to compete in the market for fixed combinations of amlodipine and valsartan until September 30, 2014, thereby allocating the entire Exforge market to Novartis until that date, and (2) Novartis agreed not to compete in the generic Exforge market from September 30, 2014 to March 30, 2015, thereby allocating the entire market for generic versions of Exforge to Par for six months.

6.      Specifically, on information and belief, the Agreement contained a promise by Novartis to refrain from launching an "authorized generic" version of Exforge for the first six months after Par's launch, thereby depriving the market of an additional competitor and lower prices.

7.      On March 19, 2010, the FDA granted tentative approval to Par's ANDA for a generic version of Exforge, determining that Par's ANDA for generic Exforge was approvable and satisfied all bioequivalence, chemistry, manufacturing, and controls ("CMC"), and labeling requirements. On March 28, 2013, the FDA granted final approval to Par's ANDA for a generic version of Exforge. On information and belief, the FDA granted tentative approval to Synthon's ANDA for a generic version of Exforge prior to March 28, 2013, determining that Synthon's ANDA for generic Exforge was approvable and satisfied all bioequivalence, CMC, and labeling requirements.

8.      Because of Defendants' unlawful Agreement and conduct, no generic version of Exforge was available in the United States, including its territories, possessions, and the Commonwealth of Puerto Rico, until September 30, 2014 and, for a period of six months thereafter, the only generic available was Par's product.

9.      But for Defendants' unlawful Agreement and conduct, one or more generic versions of Exforge would have entered the market as early as September 21, 2012, when the

exclusivities associated with the '578 Patent expired, but no later than March 29, 2013.

10. Thus, absent Defendants' unlawful Agreement and conduct, Plaintiff and the members of the Class would have (1) been able to satisfy their requirements for fixed combinations of amlodipine and valsartan at significantly lower prices substantially earlier than they did, rather than being forced to pay for branded Exforge at higher prices because of the unlawful Agreement; and (2) benefited from competition for generic versions of Exforge earlier than they did.

11. Defendants' unlawful Agreement was designed to and did in fact: (1) delay and/or preclude the entry of less-expensive generic versions of Exforge; (2) preclude the introduction of an authorized generic version of Exforge that otherwise would have appeared on the market at an earlier time; (3) fix, raise, maintain or stabilize the prices of fixed combinations of amlodipine and valsartan; and (4) permit Novartis to maintain a monopoly for fixed combinations of amlodipine and valsartan.

12. By and through the Agreement, Novartis and Par afforded themselves a guarantee of higher revenues both during the period in which Par agreed to delay generic entry and during Par's 180-day period of generic market exclusivity, all of which resulted in anticompetitive overcharges being thrust upon purchasers.

13. Defendants thus violated §§ 1 and 2 of the Sherman Act through their anticompetitive Agreement and conduct to improperly maintain and extend Novartis's market and monopoly power by foreclosing or delaying competition from lower-priced generic versions of fixed combinations of amlodipine and valsartan.

14. The Agreement caused illegal anticompetitive harm to the direct purchasers of Exforge by causing them to pay higher, artificially-inflated prices for Exforge and generic versions of Exforge than they would have absent the conduct alleged herein. Plaintiff, and all others

similarly situated, were injured and sustained damages in the form of overcharges for branded and

generic forms of Exforge as a direct result of Novartis's and Par's unlawful Agreement. This civil

antitrust case seeks overcharges (trebled) paid by Plaintiff and a class of all other persons or entities

in the United States, including its territories, possessions, and the Commonwealth of Puerto Rico,

who purchased Exforge directly from Novartis and/or generic Exforge tablets directly from Par at

any time during the Class Period from September 21, 2012 (or earlier, if pediatric exclusivity did

not apply), until the effects of Defendants' conduct cease.

## JURISDICTION AND VENUE

15.     This Complaint is filed and these proceedings are instituted under Section 4 of the

Clayton Act, 15 U.S.C. § 15(a), to recover treble damages and the costs of suit, including

reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class resulting

from violations by Defendants, as herein alleged, of Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§ 1 and 2. The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1337(a) and

15 U.S.C. § 15.

16.     The Defendants named herein transact business within this judicial district, and the

interstate trade and commerce hereinafter described is carried out, in substantial part, in this

district. Venue, therefore, is appropriate within this district under 15 U.S.C. § 22 and 28 U.S.C. §

1391(b) and (c).

## THE PARTIES

17.      Plaintiff Rochester Drug Co-Operative, Inc. is a stock corporation duly formed and

existing under the New York Cooperative Corporations Law that maintains its principal place of

business at 50 Jet View Drive, Rochester, New York 14624.  Plaintiff Rochester Drug Co-

Operative, Inc. purchased branded and generic Exforge directly from Novartis and Par,

respectively, during the Class Period as defined below; and was injured by the illegal conduct described herein.

18.     Defendant Novartis Pharmaceuticals Corporation is a corporation organized and existing under the laws of the State of Delaware. Novartis Pharmaceuticals Corporation's principal place of business is at One Health Plaza, East Hanover, New Jersey 07936. Novartis Pharmaceuticals Corporation is a subsidiary of Defendant Novartis AG and the NDA holder/applicant as well as a distributor for the prescription drug Exforge. Novartis Pharmaceuticals Corporation has locations in New York, New Jersey and California. As the pharmaceuticals unit of Novartis Corporation and Novartis AG, Novartis Pharmaceuticals Corporation develops, manufactures, sells, and markets Novartis Corporation's and Novartis AG's drugs in the United States.

19.     Defendant Novartis AG is a corporation organized and existing under the laws of Switzerland, having an office and a place of business at Lichtstrasse 35, CH-4056, Basel, Switzerland.

20.     Defendant Novartis Corporation is a corporation organized and existing under the laws of the State of New York, having its principal place of business at One Health Plaza, East Hanover, New Jersey 07936. Novartis Corporation is essentially the U.S. headquarters of Switzerland-based Novartis AG. Novartis Corporation handles the administration, sales, and marketing of a wide variety of prescription drugs, vaccines, consumer medicines, and veterinary products. It is the parent corporation of Novartis Pharmaceuticals Corporation—its and Novartis AG's pharmaceuticals unit.

21.     Defendant Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York, 10977. Par Pharmaceutical,

Inc. principally develops, manufactures and markets generic versions of brand name drugs.

22.    Defendant Endo Pharmaceuticals, Inc. is a Delaware corporation, having its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania, 19355.

23.    Defendant Endo International plc is a private limited company incorporated and existing under the laws of Ireland, having its principal place of business at 1st Floor, Minerva House, Simmonscourt Road, Ballsbridge, Dublin 4, Ireland, and a U.S. headquarters at 1400 Atwater Drive, Malvern, Pennsylvania, 19355.  Endo Pharmaceuticals, Inc. and Endo International plc are referred to collectively as "Endo."  On September 28, 2015, Defendant Endo completed an acquisition of Defendant Par Pharmaceutical, Inc.  On information and belief, Endo assumed all of Par Pharmaceutical, Inc.'s liabilities upon acquiring it.

24.    All of Defendants' actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

## CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action on behalf of itself and, under Rule 23 of the Federal Rules of Civil Procedure, as representative of a class defined as follows:

> All persons or entities in the United States, including its territories, possessions, and the Commonwealth of Puerto Rico, who purchased Exforge directly from Novartis, or who purchased a generic version of Exforge directly from Par, at any time during the Class Period from September 21, 2012, until the effects of Defendants' conduct ceases (the "Class"). Excluded from the Class are Defendants and their officers, directors, management and employees, predecessors, subsidiaries and affiliates, and all federal governmental entities.

26.     Members of the Class are so numerous that joinder is impracticable. While the exact number of Class members is unknown to Plaintiff, it is believed to be between approximately fifty and one-hundred fifty. Furthermore, the Class is readily identifiable from information and records in the possession of Defendants.

27.     Plaintiff's claims are typical of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct by the Defendants, *i.e.*, they paid artificially inflated prices for Exforge and its generic equivalents, and were deprived of the benefits of competition from less-expensive generic versions of Exforge as a result of Defendants' anticompetitive conduct.

28.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

29.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, particularly class action antitrust litigation in the pharmaceutical industry.

30.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because the Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable questions are inherent in Defendants' wrongful conduct.

31.     Questions of law and fact common to the Class include:

a.     whether the conduct alleged herein constitutes a violation of the antitrust laws;

b.     whether a relevant market needs to be defined in this case in light of the existence of direct evidence of Novartis's power to exclude generic competition and charge supra-competitive prices for Exforge;

c.      if a relevant market needs to be defined, the definition of the relevant market for analyzing Novartis's monopoly power, and whether Novartis had monopoly power in the relevant market;

d.      whether Defendants' actions illegally maintained Novartis's monopoly power in the relevant market;

e.      whether Defendants' actions constituted an illegal market allocation agreement;

f.      whether the activities of Defendants as alleged herein have substantially affected interstate commerce; and

g.      whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of its direct purchaser customers and if so, the appropriate measure of damages.

32.      Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that may not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

33.      Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## REGULATORY BACKGROUND

**The Regulatory Structure for Approval of Drugs**

34.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer who creates a new drug must obtain the approval of FDA to sell the new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents. 21 U.S.C. §§ 355(a), (b).

35.     When FDA approves a brand manufacturer's NDA, the brand manufacturer must list in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations (called the "Orange Book") any patent that it certifies (1) claims either the approved drug product or approved methods of using the drug product and (2) could reasonably be asserted against a generic manufacturer who makes, uses, or sells the drug product without authorization prior to the expiration of the listed patent(s). Patents issued after NDA approval must be listed in the Orange Book within 30 days of issuance. 21 U.S.C. §§ 355(b)(1) & (c)(2).

36.     FDA relies completely on the brand manufacturer's certification about its patents, as FDA does not have the resources or authority to verify for accuracy or trustworthiness the manufacturer's assertions regarding its patents. In listing patents in the Orange Book, the FDA merely performs a ministerial act.

### 1.     The Hatch-Waxman Amendments

37.     The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug

may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's NDA, and must show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug. This establishes that the generic drug is both pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. *See generally* 21 U.S.C. §355(j) *et seq.*

38.   The FDCA and Hatch-Waxman Amendments operate on the proven scientific principle that bioequivalent drug products containing identical amounts of the same active ingredient(s), having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic drug is absorbed at the site of drug action to the same extent and for the same amount of time as the brand counterpart. 21 U.S.C. § 355(j)(8)(B). Thus, a generic drug is identical to a brand name drug in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use. Generic drugs that are therapeutically equivalent to their brand counterparts are given an "AB" rating by FDA, allowing their substitution for the brand when a prescription for the brand is presented at the pharmacy.

39.   Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate (non-infringing) generic competitors, thereby reducing healthcare expenses nationwide. Congress also included provisions allowing for the extension of patent terms to recover time spent developing new pharmaceutical products, thereby bolstering pharmaceutical companies' financial incentives to create new and innovative products.

40. The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic revenues for brand name pharmaceutical companies. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for brand and generic drugs totaled $21.6 billion; by 2013, total prescription drug revenue had climbed to more than $329.2 billion, with generic drugs accounting for 86% of prescriptions.[1] Generics are now dispensed 95% of the time when a generic form is available.[2]

### 2.   Paragraph IV Certifications

41. To obtain FDA approval of an ANDA prior to the expiration of a patent or patents listed in the Orange Book, a generic manufacturer must certify that the generic drug proposed in its ANDA will not infringe any valid patents listed as claimed by the brand drug. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

    a.    that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

    b.    that the patent for the brand drug has expired (a "Paragraph II certification");

    c.    that the patent for the brand drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or

    d.    that the patent for the brand drug is invalid, unenforceable, and/or will not

---

[1] *See* IMS INSTITUTE FOR HEALTHCARE INFORMATICS, MEDICINE USE AND SHIFTING COSTS OF HEALTHCARE, at 30, 51 (Apr. 2014).
[2] *Id.* at 51.

be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

42.     If a generic manufacturer files a Paragraph IV certification that the listed patent is invalid, unenforceable and/or will not be infringed, it must serve timely notice to the brand manufacturer. The filing of an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement pursuant to 35 U.S.C. § 271(e)(2). If the brand manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notice of the Paragraph IV certification, FDA will not grant final approval to the ANDA until the earlier of (a) the passage of thirty months (the "30-month stay"), or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. The FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the existence of an unexpired patent for which the generic filer has submitted a Paragraph III certification (that the generic does not intend to market the ANDA product prior to the expiration of the patent) or the existence of a regulatory exclusivity, such as the 30-month stay arising from Paragraph IV litigation.

43.     If a brand manufacturer does not bring suit within 45 days of receiving notification of the Paragraph IV certification, it will not be entitled to a 30-month stay, and the FDA will not be prevented from granting final approval to the ANDA assuming other regulatory requirements (such as bioequivalence) are satisfied.

**3.     First-filer's 180 day exclusivity period**

44.     Generics may be classified as (1) first-filer generics, (2) later-filing generics, and (3) the brand's own authorized generic.

45.     To encourage manufacturers to seek approval of generic versions of brand drugs,

the Hatch-Waxman Amendments grant the first generic manufacturer who files an ANDA with a Paragraph IV certification (the "first-filer") a 180-day period to market the generic version of the drug, during which the FDA may not grant final approval to any other later-filing generic manufacturer's ANDA for the same brand drug. 21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D). That is, when a first-filer files a substantially complete ANDA with the FDA and certifies that unexpired patents listed in the Orange Book as covering the brand product are either invalid, unenforceable, or not infringed by the generic's product, the FDA cannot approve a later-filing generic company's ANDA until that first-filing generic has been on the market for 180 days, or until the first-filer exclusivity has been forfeited.

46.    The Supreme Court has recognized that "this 180 day period of exclusivity can prove valuable, possibly worth several hundred million dollars" to the first filer.[3]

47.    A first-filer that informs FDA that it intends to wait until all Orange Book listed patents expire before marketing its product does not get a 180-day exclusivity period.   Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents, or to invent around such patents by creating non-infringing generics.

48.    An "authorized generic" or "AG" is simply the brand product sold under generic trade dress at a cheaper price than the brand. Because the AG is already approved under the brand manufacturer's NDA, it can be marketed at any time, including during the first-filer's 180 day exclusivity period.

**The Competitive Effects of AB-Rated Generic Competition.**

49.    Generic versions of brand drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective as their brand counterparts. The only

---

[3] *FTC v. Actavis, Inc.*, 570 U.S. 136, 133 S. Ct. 2223, 2229 (2013).

material difference between generic drugs and their corresponding brand versions is their price. Because generic versions of a corresponding brand drug product are commodities that cannot be differentiated, the primary basis for generic competition is price. On average, generics are around 30% less expensive than their brand counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand. Consequently, the launch of a generic drug usually results in significant cost savings for all drug purchasers.

50. Since the passage of the Hatch-Waxman Amendments, every state has adopted laws that either require or permit pharmacies to automatically substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician has specifically ordered otherwise). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing. Once a generic equivalent hits the market, the generic quickly captures sales of the corresponding brand drug, often capturing 80% or more of the brand's sales within the first six months.

51. Once multiple generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[4]  In a 2010 study, the Federal Trade Commission ("FTC") found that on average, within a year of generic entry, generics had captured 90% of corresponding brand drug sales and (with multiple generics on the market) prices had

---

[4] *See, e.g.*, Patricia Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?*, J.L. & ECON. (Oct. 2000); Tracy Regan, *Generic Entry and Price Competition in the Prescription Drug Market--18 Years after the Waxman-Hatch Act* (Univ. of Miami, Dep't of Econ., Working Paper, Feb. 14, 2004); R. Frank, *The Ongoing Regulation of Generic Drugs*, NEW ENG. J. MED., v. 357, pp. 1993-96 & n.20 (Nov. 2007).

dropped 85%.[5]  As a result, competition from generic drugs is viewed by brand drug companies as a grave threat to their bottom lines.

52.    Generic competition enables all members of the proposed Class to: (a) purchase generic versions of a drug at substantially lower prices; and/or (b) purchase the brand drug at a reduced price.

53.    Once exclusivity is lost and generic entry occurs – an event sometimes referred to as the "patent cliff" – the brand manufacturer can expect a significant drop in profits, as it is forced to either compete by dramatically lowering prices, or accept dramatically lower sales. The tradeoff of longer exclusivity rights in return for quick and effective generic entry after loss of exclusivity was fundamental to the policies and procedures that Congress established in the Hatch-Waxman Act, and embraced by the states in their generic substitution laws. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics."[6]

54.    Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to profitably charge supracompetitive prices. Brand manufacturers, such as Novartis, are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus seek to stall the impact of generic competition for as long as possible, sometimes (as here) resorting to illegal means.

---

[5] *See* FTC, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS (Jan. 2010) ("FTC Pay-for-Delay Study), *available at* http://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf (last accessed June 15, 2018).
[6] FDA WEBSITE, GENERIC DRUGS UNDERGO RIGOROUS FDA SCRUTINY, *available at* https://www.fda.gov/ForConsumers/ucm340343.htm (last accessed June 15, 2018).

**Brand and Generic Companies Have Strong Financial Incentives to Agree to Anticompetitive Terms**

55.    One way that brand manufacturers game the system to anticompetitive effect is by paying generic manufacturers to delay entering the market. These agreements not to compete are sometimes known as "exclusion payment agreements" or "pay-for-delay agreements." Brand and generic manufacturers execute exclusion payment agreements to take advantage of the regulatory consequences associated with the generic manufacturer's Paragraph IV certification to patents listed by the brand manufacturer in the Orange Book.

56.    In a typical exclusion payment agreement, the brand manufacturer pays a generic manufacturer to delay or abandon market entry. The brand manufacturer preserves its monopoly by effectively paying some of the monopoly profits to the generic manufacturer, which in turn agrees to delay marketing its product.

57.    One method of payment to a first-filing generic company comes in the form of the brand company's promise to not launch an "authorized generic" version of the brand drug during the first 180 days of generic marketing. As discussed above, an authorized generic is the brand drug, manufactured just like the brand product, but sold as a generic product under the same approval as the brand product's original NDA. Because the brand manufacturer already has approval to sell its brand drug, it does not need to file an ANDA, or obtain any additional approval, to market an authorized generic version of its own brand drug. ANDA filers have no patents on, and no right to be free from competition with, an authorized generic version of the brand drug.

58.    For the brand company, an authorized generic launched during the first 180 days of generic marketing (or longer) provides a low cost, low risk means to regain some of the revenue lost from the termination of brand exclusivity. For the generic manufacturer enjoying exclusivity

as the first generic to be marketed, however, an authorized generic launch has a huge negative impact on its revenue. A generic company generally earns about 80% of its total income from a given generic product during the period that it is the sole generic on the market. An authorized generic, when launched during that time, is typically priced competitively as against the other generics, and will capture 50% or more of total generic sales during that period. A brand's promise not to launch an authorized generic during the initial period of generic marketing is thus a very valuable payment to the generic company that is the first-filer generic entrant. It doubles the first-filer generic entrant's sales volume during that time, and because it removes a source of price competition from the market, it more than doubles the first-filer generic entrant's revenues and profits. Correspondingly, a brand's promise not to launch an authorized generic represents a substantial sacrifice of the revenues and profits that the authorized generic would otherwise have created for the brand. Those revenues and profits are instead ceded, by way of the no-authorized-generic promise, to the generic company.

59.     In a report by the Federal Trade Commission ("FTC") issued at the request of Congress in 2011 entitled *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* ("*Authorized Generic Drugs*"), the FTC concluded that no-authorized-generic promises are being used as a payment by brands to generics for delayed generic entry. The FTC analyzed documents and empirical data covering more than 100 companies and found that the presence of authorized generic competition reduces the first-filer generic's revenues by more than 50% during the first 180 days of generic marketing.[7]

60.     The FTC found that a generic company makes significantly less money when it

---

[7] *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* at iii, vi, 41-48, 57-59, available at https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf (last accessed June 15, 2018).

competes with an authorized generic because (1) the authorized generic takes a significant share of generic sales away from the first-filer (around 50%), and (2) wholesale and retail prices decrease when the first-filer faces an authorized generic due to competition between the two. Both of these factors reduce the generic company's sales and revenues. With a no-authorized-generic promise, the generic company avoids this reduction in revenue. The FTC noted that "there is strong evidence that agreements not to compete with an authorized generic have become a way for brand-name companies to compensate generic competitors for delaying entry."[8]  These agreements can be part of 'pay-for-delay' patent settlements, which have long concerned the FTC.[9]

61.     A 2006 study sponsored by the brand drug company trade association, PhRMA, similarly found that competition from an authorized generic results in lower generic prices.[10]

62.     An agreement between a brand and generic drug company — horizontal competitors — that the brand company will withhold an authorized generic from the market in exchange for the generic company's agreement to delay market entry with its generic version of the brand drug, injures consumers twice over:  first, by prolonging the period during which only the high-priced brand is available, and second, by ensuring that, once delayed generic competition begins, generic prices are artificially inflated because of the absence of the authorized generic.

63.     For a first-filer generic like Par, of a brand product like Exforge, the difference between (1) selling the only generic product and (2) selling a generic product while competing against an authorized generic, for the first months of generic marketing, constitutes a very large payment – reaching hundreds of millions of dollars. These economic realities are well known in

---

[8] *See id*. at vi.

[9] *See id*. at vi-vii.

[10] *Id.* at 5 n.21 (citing IMS CONSULTING, IMS HEALTH, ASSESSMENT OF AUTHORIZED GENERICS IN THE U.S. (2006) (written for PhRMA), available at http://replay.web.archive.org/20061009134405/http://www.phrma.org/files/IMS%20Authorized%20Generics%20Report_6-22-06.pdf).

the pharmaceutical industry, and the FTC's authorized generic report cites numerous documents from industry participants confirming the financial impact of an authorized generic and, by necessary implication, its absence.

64.     When no-authorized-generic covenants are made by a brand manufacturer in exchange for a generic manufacturer's agreement to delay its product launch, horizontal competitors are allowed to benefit from their agreement not to compete and purchasers are correspondingly denied the consumer surplus that should flow to them from increased competition.

65.     Here, Par agreed to delay competing in the market for Exforge. The quid pro quo for Par's agreement to delay competing in the market for Exforge was compensation Novartis provided to Par including cash and/or non-cash value. On information and belief, Novartis made a large payment to Par through an agreement to refrain from marketing an authorized generic version of Exforge and/or some other commercial arrangement whose fair market value constituted a net payment to Par.

**Pay-for-Delay Agreements with First-Filers Can Create Bottlenecks for Later-Filing Generics**

66.     An anticompetitive agreement entered into between the brand and first-filer generic often subjects later ANDA filers to the delayed entry date agreed to between the brand manufacturer and its conspiring first-filer generic.

67.     In the absence of an anticompetitive agreement between the brand company and the first-filer, the later ANDA filers have pro-competitive incentives. They are motivated to enter the market as early as possible.

68.     But the later ANDA filers cannot obtain final FDA approval to enter the market until the first-filer's 180-day exclusivity has run or been forfeited. While later ANDA filers may

force the first-filer to forfeit its 180-day exclusivity by prevailing against the brand in a patent litigation, such as through a declaratory judgment action, such a prospect is not attractive to later ANDA filers. This is because it is not an attractive proposition for the later ANDA filers to bear the brunt of the litigation costs only to (1) force the first filer to forfeit its 180 days of exclusivity, and (2) then enter a highly competitive market with a number of later ANDA filers.  Instead, the later ANDA filers will wait out the bottleneck created by the first-filer's 180-day exclusivity.

69.     Such agreements are fundamentally anticompetitive and are contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand manufacturer's monopoly profits by blocking access to more affordable generic drugs, forcing purchasers to buy the expensive brands instead.

## FACTUAL ALLEGATIONS

### A.     The Defendants' Products and the Nature of Sales of Generic Equivalent Products

70.     High blood pressure and its consequences affect an estimated one in four adults; that is roughly a billion people worldwide. The disorder is the leading cause of risk-attributable death, accounting for more than 7 million deaths per year. A person dies somewhere in the world from a hypertension-related disease every five seconds.

71.     On June 20, 2007, the FDA approved Novartis's NDA for Exforge tablets. Shortly thereafter, Exforge tablets were launched into the U.S. marketplace. At that time, Exforge was the first high blood pressure medication to combine the most commonly prescribed branded high blood pressure medicines in their respective classes – the calcium channel blocker ("CCB") amlodipine besylate (marketed under the brand name Norvasc) and the angiotensin-II receptor blocker ("ARB") valsartan (marketed under the brand name Diovan).

72.     Novartis already had intellectual property rights to Diovan, but its plan was to

combine the active ingredients in Diovan and Norvasc, the latter of which is a Pfizer product, as soon as Pfizer's patents expired in September, 2007. However, on March 22, 2007 the Federal Circuit invalidated Pfizer's Norvasc patents, paving the way for earlier FDA approval of Novartis's Diovan/Norvasc combination.

73.     Novartis claimed that Exforge, the combination of valsartan and amlodipine, offered patients the convenience of a reduced pill load for their hypertension medication, increasing patient adherence.

**Novartis's Patents**

74.     Novartis listed three patents in the FDA Orange Book under NDA No. 21-990 for Exforge: the '578 Patent; the '197 Patent; and the '728 Patent. The '578 Patent, which disclosed and claimed the chemical compound valsartan, expired on March 21, 2012. A regulatory exclusivity known as pediatric exclusivity[11] attached to the '578 Patent expired on September 21, 2012. Neither the '197 Patent nor the '728 Patent afforded Novartis the right or ability to exclude generic competition for Exforge, and therefore Novartis had no legitimate basis for excluding generic competition after September 21, 2012. Had the '197 or '728 Patents been litigated in the courts, they would have been adjudged invalid, unenforceable and/or not infringed.

75.     On or about October 1, 2007, Par filed abbreviated new drug application ("ANDA") No. 90-011. March 28, 2013 FDA Approval Letter at 1. Par's ANDA No. 90-011 included Paragraph IV certifications for the '197 and '728 Patents. *Id.* at 2. According to FDA, the Paragraph IV certifications stated that "each of these [two] patents is invalid, unenforceable, or will not be infringed by [Par's] manufacture, use, or sale of Amlodipine and Valsartan Tablets, 5

---

[11] As a result of conducting tests in pediatric age groups, the FDA granted Novartis a six-month regulatory exclusivity called pediatric exclusivity.

mg/160 mg, 10 mg/160 mg, and 10 mg/320 mg" described in ANDA No. 90-011. *Id.* Par notified Novartis of its Paragraph IV certifications and the bases for them, but Novartis never sued Par for patent infringement. *Id.* On information and belief, the patent defenses set forth in Par's Paragraph IV certification notice letter were meritorious and would have succeeded had they been litigated.

76.     No valid claim of the '728 Patent was infringed by Par's filing of ANDA No. 90-011 or the manufacture or sale of Par's generic version of Exforge. First, the claims of the '728 Patent are properly construed to be limited to the use of a combination of valsartan and amlodipine for the treatment of hypertension in the limited subset of patients suffering from diabetes and could not have afforded Novartis any right to exclude generic competition beyond that very narrow use. The '728 Patent issued from United States Application Serial No. 09/757,413 ("the '413 Application"), which is a divisional of United States Application Serial No. 09/349,654 ("the '654 Application"). The original claims of the '654 Application broadly recited (1) "[a] method for the treatment or prevention of [a wide variety of different disease states] comprising administering a therapeutically effective amount of a combination" of valsartan, a calcium channel blocker and a pharmaceutically acceptable carrier; and (2) "[a] pharmaceutical combination composition comprising" those same ingredients. '654 Application at 11. As originally filed, those claims were not limited to the use of valsartan and amlodipine in the treatment of patients suffering from diabetes. *Id.*

77.     However, the examiner at the United States Patent and Trademark Office rejected each of those claims as obvious in view of United States Patent No. 5,492,904 ("the '904 Prior Art Patent") and the prescribing information for DIOVAN ("the Prior Art Diovan Literature"). Office Action dated May 25, 2000. The examiner noted that the '904 Prior Art Patent taught the combined use of an angiotensin-II antagonist (like valsartan) and a calcium channel blocker (like

amlodipine):

> [The '904 Prior Art Patent] teach[es] pharmaceutical compositions which comprise an angiotensin-II antagonist and a calcium channel blocker of the type presently claimed which are useful in the treatment of hypertension and congestive heart failure. See the abstract and column l, lines 25-40. It is further taught that the compositions may comprise from 10 to 300 mg of the desired calcium channel blocker and from 1 to 100 mg of the angiotensin-II antagonist.

*Id.* at 2. The examiner acknowledged that the '904 Prior Art Patent did not teach valsartan, but noted that the Prior Art Diovan Literature "discloses that valsartan was a well-known angiotensin-II antagonist." *Id.* Accordingly, the examiner deemed the originally-claimed subject matter to be obvious. *Id.* at 3.

78.     The applicants for the '654 Application amended their claims, but the examiner reiterated his rejection. Office Action dated August 29, 2000 at 3-4. In response to the rejection, the applicants amended method of use claim 1 by deleting the broad recitation of disease conditions and narrowing it to the treatment of "hypertension *associated with diabetes*." Amendment After Final Rejection dated October 20, 2000 at 1-2. Thereafter, the '654 Application issued as United States Patent No. 6,204,281.

79.     The '413 Application was filed as a divisional application on January 9, 2001 along with a preliminary amendment whose claims were similar to those that had been originally filed in the '654 Application. The examiner rejected the claims pending in the '413 Application as obvious for the same reason he had rejected the claims in the '654 Application. April 27, 2001 Office Action at 3. In response to the rejection, and consistent with their amendment in the '654 Application, the applicants limited claim 1 to the treatment of "hypertension associated with diabetes." Amendment dated July 25, 2001 at 3. In explaining why the amendment would overcome the examiner's obviousness rejection, which applied to <u>all</u> pending claims including the method claims, the applicants argued that they had shown unexpected results in the treatment of

diabetes:

> Applicants have clearly shown unexpected results in the treatment of diabetic associated with hypertension with the combination of valsartan and verapamil. For example, on page 6 to page 7 of the instant application (inserted by this amendment), Applicants have shown that treatment with the combination of valsartan and verapamil resulted in a considerable reduction of sudden death events and significant degree of increase of the survival rate as compared to the administration of the single drugs alone. These unexpected results are sufficient to overcome the obviousness rejection based on the references because a combination of the references do not teach or suggest the treatment of hypertension associated with diabetes.

*Id.* at 4. Thus, while the composition of matter claims did not refer explicitly to diabetes, the applicants' argument was premised on the view that those claims were also limited to the use of the claimed pharmaceutical composition in patients suffering from diabetes. *Id.* ("Claims 1-9 have been rejected . . . . Applicants respectfully traverse this rejection. *The claims are now directed to hypertension associated with diabetes*.") (emphasis added).

80.    The examiner nevertheless again rejected the claims. Office Action dated August 1, 2001. In response, the applicants further amended the claims to limit them to the use of valsartan with amlodipine. In doing so, they again made clear that both the method of use and composition of matter claims should be viewed as limited to the use in the "treatment of hypertension associated with diabetes":

> Claims 1, 4 and 9 have been amended to recite amlodipine as the selected calcium channel blocker. The treatment of hypertension associated with diabetes by administering a combination of valsartan and amlodipine is neither taught nor suggest by the cited references. Accordingly, the rejection has been overcome and should be withdrawn.

Amendment After Final Rejection dated September 24, 2001. Par was not seeking FDA approval to market its product for the treatment of hypertension associated with diabetes, and therefore could not induce infringement of any claim that was limited to this use.

- 25 -

81.     In addition, the claims of the '728 Patent are invalid in view of the prior art. United States Patent No. 5,492,904 ("the '904 Prior Art Patent") issued on February 20, 1996, more than three years before the earliest possible effective filing date of the '728 Patent, and is therefore prior art to the '728 Patent. The '904 Prior Art Patent is titled "Composition of Angiotensin-II Receptor Antagonists and Calcium Channel Blockers" and teaches the use of a pharmaceutical composition comprising an angiotensin-II receptor antagonist and a calcium channel blocker for the treatment of hypertension. '904 Prior Art Patent at 1:15-40. The '904 Patent also teaches that "the combinations of active compounds can be administered alone, but are generally administered with a pharmaceutical carrier selected on the basis of the chosen route of administration and standard pharmaceutical practice." *Id*. at 4:37-40. It also teaches that "[t]he combinations of this invention can be administered for the treatment of hypertension" and that the "[p]harmaceutical compositions of the invention may contain from 10 to 300 mg of the desired calcium channel blocker and 1 to 100 mg of the angiotensin-II receptor antagonist per unit dose one or more times daily." *Id.* at 4:4-5 and 44-48. The '904 Prior Art Patent also references certain disease states involving "diabetic" conditions. *Id.* at 3:56-4:3.

82.     Although the '904 Prior Art Patent does not explicitly reference valsartan, that is completely unsurprising. The patent application that issued as the '904 Prior Art Patent was filed on July 28, 1994, whereas the prior art '578 Patent disclosing valsartan did not issue until March 21, 1995. Thus, the '904 Prior Art Patent was filed before valsartan was publicly disclosed by the '578 Patent. However, as soon as the '578 Patent was issued and disclosed valsartan, it would have been obvious to use valsartan as the angiotensin-II receptor antagonist in the combination treatment taught by the '904 Prior Art Patent.

83.     No valid claim of the '197 Patent was infringed by Par's filing of ANDA No. 90-

011 or the manufacture or sale of Par's generic version of Exforge. The '197 Patent issued on September 25, 2001 from an application filed on June 18, 1997. The '197 Patent includes fifty-three (53) claims, of which only four are independent claims. "It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to be infringed." *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553, 10 U.S.P.Q.2d 1201, 1208 (Fed. Cir. 1989). Each of the independent claims in the '197 Patent requires a compressed solid dosage form (or a process for forming or method of using such a compressed solid dosage form) comprising either (1) greater than 35% by weight valsartan; and/or (2) the active ingredient hydrochlorothiazide ("HCTZ") in combination with valsartan. Neither Exforge nor any generic version of Exforge contains or could contain the active ingredient HCTZ. Accordingly, the claims of the '197 Patent could cover a generic version of Exforge only if valsartan were present at greater than 35% by weight of the dosage form. On information and belief, at all relevant times Par's generic version of Exforge contained less than 35% by weight valsartan, and thus could not literally infringe any of the claims of the '197 Patent.

84.     As a matter of law, the claims of the '197 Patent cannot cover generic versions of Exforge that contain 35% or less by weight valsartan under the doctrine of equivalents. First, "[a] doctrine of equivalents theory cannot be asserted if it will encompass or 'ensnare' the prior art." *Jang v. Boston Sci. Corp.*, 872 F.3d 1275, 1285 (Fed. Cir. 2017). Here, the '578 Patent is prior art to the '197 Patent and discloses a tablet that is 35.7% by weight valsartan. '578 Patent at 63:24-52 (example 93). Any doctrine of equivalents theory that encompassed a compressed solid dosage form having 35% or less valsartan would therefore improperly cover the prior art. Second, "[i]f a theory of equivalence would vitiate a claim limitation . . . then there can be no infringement under the doctrine of equivalents as a matter of law." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed.

Cir. 1998); *see also Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) ("[T]o allow what is undisputedly a minority (i.e., 47.8%) to be equivalent to a majority would vitiate the requirement that the 'first and second longitudinal strips of adhesive . . . extend the majority of the lengths of said longitudinal marginal portions.'"). Here, allowing a claim limitation that requires solid dosage forms comprising "more than" 35% by weight valsartan to cover solid dosage forms having "less than" 35% by weight valsartan would vitiate a claim limitation and would therefore be improper.

85.    In addition, the relevant claims of the '197 Patent are invalid. The earliest effective filing date for the '197 Patent is June 18, 1997, and therefore, the '578 Patent that issued on March 21, 1995 is prior art to the '197 Patent. Claim 1 of the '197 Patent, for example, recites the following:

> 1.    A compressed solid dosage form comprising a) an active agent containing an effective amount of Valsartan or a pharmaceutically acceptable salt thereof; and, b) at least one pharmaceutically acceptable additive wherein the active agent is present in an amount of more than 35% by weight based on the total weight of the compressed solid dosage form.

'197 Patent at 10:22-30. The '578 Patent anticipates this claim, thereby rendering it invalid. '578 Patent at 63:25-52 (example 93). More specifically, the prior art '578 Patent teaches a tablet (*i.e.*, a compressed solid dosage form) comprising 35.7% valsartan and a number of pharmaceutically acceptable additives including, for example, lactose. *Id.*

86.    The Patent Office examiner apparently did not understand that example 93 of the '578 Patent related to valsartan. Valsartan is a generic name for the chemical compound (S)-N-(1-carboxy-2-methylprop-1-yl)-N-pentanoyl-N-[2'-(1H-tetrazol-5-yl)-biphenyl-4-ylmethyl-] amine. The '578 Patent does not use the term "valsartan" but rather referred to the compound by its chemical name. Had the examiner understood that that example 93 of the '578 Patent referred to valsartan, he would have rejected claim 1 under 35 U.S.C. § 102.

87.     Rather than disclose to the examiner that example 93 of the '578 Patent related to valsartan, the applicants exploited the examiner's lack of appreciation. For example, when the examiner rejected the claims based on a different prior art reference, the applicants made arguments that could not have been made had the examiner appreciated example 93 of the '578 Patent. For example, after the examiner rejected the pending claims based in part on the Muller prior art reference, the applicants argued:

> In this case, the combination of references cited by the Examiner provides no teaching, suggestion or motivation to produce the solid dosage forms of valsartan as claimed by Applicant. Muller teaches a valsartan capsule and does not teach whether the capsule is a compressed dosage form. Muller also fails to disclose any detail about the formulation of the valsartan capsule. Indeed, Muller lacks any disclosure regarding the relative weight of valsartan in the capsule.

Amendment dated July 27, 2010 at 10. Notably, the teaching that the applicants argued was absent from the prior art references cited by the examiner was precisely the teaching supplied by the prior art '578 Patent. The applicants also argued that "[t]he unique chemical properties of angiotensin type II receptor antagonists have made it difficult in some cases to develop formulations useful for the creation of tablets." March 12, 2001 Amendment at 4. But again, this argument could not have been made had the examiner known that the prior art '578 Patent taught a tablet form of valsartan.

88.     As another example, claim 5 of the '197 Patent depends from claim 1 and recites that the valsartan dosage range is from "40 to 160 mg." '197 Patent at 10:42-43. Example 93 of the '578 Patent taught a 100 mg valsartan dosage and therefore the '578 Patent also anticipates and renders invalid claim 5.

89.     The fact that Novartis never sued Par on the '197 or '728 Patents reflects Novartis's belief that those patents did not afford Novartis any right to exclude Par from marketing its generic version of Exforge.

**Par and Synthon File ANDAs for Generic Versions of Exforge and Novartis Chooses Not to Bring Suit**

90.    Generic manufacturers Par and Synthon recognized the huge market potential for Exforge and, in or about the fall of 2007, were the first generic firms to file ANDAs with the FDA containing Paragraph IV certifications to certain Exforge patents. Par filed ANDA 90-011 on October 1, 2007 for the 10/160, 5/160, 10/320 milligram strengths of Exforge, and, on information and belief, was the first applicant to file a substantially complete application containing a Paragraph IV certification for those three strengths, making Par eligible for 180 days of regulatory exclusivity. Synthon filed ANDA 90-144 on November 26, 2007 for the 5/320 milligram strength of Exforge and, on information and belief, was the first applicant to file a substantially complete application containing a Paragraph IV certification for the 5/320 mg strength, making Synthon eligible for 180 days of regulatory exclusivity for that strength. On information and belief, Par and Synthon addressed the Orange Book-listed Novartis patents for Exforge in their ANDA filings as follows: (1) they submitted Paragraph III certifications to the '578 Patent (meaning that they would not seek to market a generic product prior to the expiration of that patent); and (2) they submitted Paragraph IV certifications to the '197 and '728 Patents (meaning they sought to enter into the market prior to the expiration of those patents, which they claimed were invalid, unenforceable, and/or would not be infringed by Par's or Synthon's generic products). Therefore, on or shortly after October 1, 2007 and November 26, 2007, respectively, Par and Synthon disclosed their intention to market their AB-rated generic products as early as September 21, 2012.

91.    Because Par and Synthon were the first companies to file substantially complete ANDAs with Paragraph IV certifications, they stood to receive a significant and potentially highly profitable benefit under 21 U.S.C. 355(j)(5)(B)(iv): 180 days of marketing exclusivity during

which the FDA would not give final approval to any other ANDA filer's generic equivalent of Exforge. As explained above, Par was the first filer for the 10/160, 5/160, and 10/320 milligram strengths, while Synthon was the first filer for the 5/320 milligram strength.

92.     On information and belief, after receiving confirmation of receipt from the FDA for their ANDAs, Par and Synthon sent notice to Novartis of their ANDAs containing Paragraph IV certifications in letters that included "a detailed factual and legal statement as to why" the '197 and '728 Patents were "invalid, unenforceable, and/or not infringed" by Par's and Synthon's ANDA Products (the "Paragraph IV Notices"). The Paragraph IV Notices included an offer of confidential access to Par's and Synthon's ANDAs as required under Hatch-Waxman. The Notices give rise to a cause of action for infringement under the Hatch-Waxman Act.

93.     Novartis did not file a lawsuit against Par or Synthon for infringement of the '197 and '728 Patents within the 45-day time period set forth in the statute to trigger a 30-month stay of ANDA approval. Accordingly, no 30-month stay ever went into effect for the Par or Synthon ANDAs.

94.     On March 19, 2010, the FDA granted tentative approval to Par's ANDA for the generic version of Exforge, indicating its determination that, aside from existing patent or regulatory exclusivities, Par's generic Exforge was otherwise approvable, and satisfied all bioequivalence, CMC, and labeling requirements.

95.     Therefore, as of March 19, 2010, and because Novartis had not sued Par for infringing the '197 and '728 Patents within 45 days of receiving Par's Paragraph IV Notice (meaning there was no 30-month stay of FDA approval), the only thing preventing Par from obtaining final FDA approval and launching its generic Exforge was the last few years of protection afforded by the '578 Patent covering the active ingredient valsartan.

96.     On information and belief, instead of suing, Novartis reached an agreement with Par to abandon its efforts to launch at the earliest possible date after the expiration of the '578 Patent and instead agree upon a delayed launch date of September 30, 2014, roughly two years after expiry of the '578 Patent. In exchange, Novartis agreed not to launch an authorized generic for the first six months after Par's entry.

97.     On information and belief, Novartis had weak patent claims that it was motivated to settle with a reverse payment in the form of a No-AG agreement, rather than risking an adverse ruling on its patents. Evidence of the weakness of the '197 and '728 Patents includes:

> a.  Par's and Synthon's ability to develop and file ANDAs with Paragraph IV certifications within a few months of FDA's approval of Exforge;
>
> b.  Novartis's decision not to sue for patent infringement and enforce its intellectual property in court; and
>
> c.  The facts set forth above and in Par's and Synthon's Paragraph IV certification notice letters.

98.     On information and belief, the Novartis patents that Par and Synthon challenged were weak and Par and/or Synthon would have won a lawsuit had Novartis filed one.

99.     But-for the Agreement, Par would have been prepared, able, and willing to launch generic Exforge as early as September 21, 2012, but no later than March 29, 2013, and would have communicated as much to the FDA and requested final approval for their ANDAs well in advance of September 21, 2012.

100.    By 2009, Exforge was already generating hundreds of millions of dollars per year in revenues for Novartis. Losing a substantial portion of that revenue stream upon expiry of the '578 Patent – as Novartis would have if the '197 and '728 Patents were held by a court to be

invalid, unenforceable, or not infringed, or if Par launched upon final FDA approval after expiry of the '578 patent – would have drastically affected Novartis's profits. Thus, Novartis had enormous incentives to avoid patent infringement litigation and avoid competition from Par by entering into the Agreement.

101.    Important details of the Agreement were not disclosed until years later. For example, a January 2012 analyst day presentation by Par lists a "Synthon/Exforge" "Business Development" arrangement in 2011. And Par's 10-K for the fiscal year ending December 31, 2011 states "[o]n November 30, 2011, we entered into an asset purchase agreement with Synthon Pharmaceuticals, Inc., and on December 30, 2011, we closed on our acquisition, of Synthon's ANDA for amlodipine besylate and valsartan (5 mg/320 mg and 10 mg/320 mg) fixed dose combination tablets, a generic version of Exforge®, for $9,600 thousand. Under the terms of a separate license agreement with Novartis Pharmaceuticals Corporation, we have a certain launch date in October 2014."[12] Similarly, Novartis's 20-F for the fiscal year ending December 31, 2011 states "In the US, under a license agreement with a generics manufacturer, the product [Exforge] is expected to face generic competition beginning in October 2014."[13] Until Novartis failed to launch an AG upon market entry by Par in September of 2014, it was not clear that Novartis intended to forgo such a launch, as important details of the license agreement between Novartis and Par were concealed. The six months of delay from Par's launch in Novartis's launch of an authorized generic constituted consideration to Par.

---

[12] Par Pharmaceutical Companies, Inc. Form 10-K for the fiscal year ended Dec. 31, 2011, at F-22, available at
https://www.sec.gov/Archives/edgar/data/878088/000087808812000027/f201110k2281210amnolinks.htm.
[13]   Novartis's 20-F for the fiscal year ending December 31, 2011, at 153, available at
https://www.novartis.com/sites/www.novartis.com/files/Novartis-20-F-2012.pdf.

102.    On information and belief, in exchange for Par's agreement to forgo selling its generic products in competition with Novartis's branded Exforge product until almost two years after the expiration of the '578 Patent, Novartis agreed to share with Par the monopoly profits from sales of branded Exforge via a covenant not to compete with Par's generic through Novartis's own sale of an authorized generic. Instead of competing, which would have resulted in lower prices of both generic and branded Exforge, Novartis and Par agreed to keep prices of both products at supracompetitive levels.

103.    The Agreement benefitted Par, which purchased Synthon's ANDA in December, 2011, by guaranteeing that it would be the sole generic on the market during the 180-day exclusivity period, which more than doubled Par's anticipated sales revenues in the exclusivity period because: (1) Par would capture all or substantially all of the sales that would have gone to the authorized generic, and (2) Par would be able to charge significantly higher prices for its generic product without price competition from the authorized generic. In addition, Par also benefited by delaying its launch of generic Exforge from September 21, 2012 to September 30, 2014 because Novartis could continue raising prices during that time, making the market more lucrative to divide once Par did enter.

104.    A brand company's launch of its own competing authorized generic is extremely costly to any first-filing generic, such as Par, because the authorized generic takes away generic sales that otherwise would go to the first filer *and* pushes down generic prices. The authorized generic also cuts into the first-filer's long term "first mover advantage." As the FTC noted in a June 2009 report on authorized generics, "consumers benefit and the healthcare system saves money during the 180-day exclusivity period when an [Authorized Generic] enters the market, due to the greater discounting that accompanies the added competition provided by the [Authorized

Generic]."[14]

105.     Novartis itself stated in public SEC filings that "[t]he company that launches an authorized generic typically launches its product at the same time as the generic exclusivity holder."

106.     Novartis's covenant not to launch an AG during Par's exclusivity period was extremely valuable to Par and went beyond what Par could have achieved if it was sued and won patent litigation pertaining to the '197 and '728 Patents. As Novartis stated in its regulatory filings, "authorized generics also reduce the value of the exclusivity for the company that invested in creating the first generic medicine to compete with the originator product. Furthermore, certain research-based companies continually seek new ways to protect their products and to decrease the impact of generic competition, thus potentially limiting the profit that the generic companies can earn on the competing generic product."

107.     Novartis sacrificed profits through its agreement not to launch an authorized generic. Absent the unlawful Agreement, it would make economic sense for Novartis to launch an authorized generic during Par's 180-day marketing exclusivity so that Novartis could retain some of the sales that Par's less expensive generic otherwise would capture.

108.     As alleged above, an authorized generic product typically captures approximately 50% of the generic sales during first 180 days of generic marketing. Thus, the no-AG provision was a very large payment to Par. Specifically, as early as May, 2006, financial analysts and media were projecting annual peak sales for Exforge of $500 million. Similarly, during Novartis AG's

---

[14] *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* at ii, available at https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf (last accessed June 15, 2018).

third quarter, 2007 earnings call, Thomas Ebeling, the CEO of its pharma division, expressed optimism that Exforge would become a "blockbuster drug" in the United States, which is an industry designation for drugs that reach $1 billion in sales. By 2014, Novartis's annual Exforge sales were over $400 million. Using the most conservative of these numbers, Defendants could assume that 6 months of sales would generate revenue of at least $200 mmillion (6/12 * $400 million).

109.    As is common in the pharmaceutical industry, the first generic is expected to take 80% (or more) of the brand sales. Thus, approximately $160 million worth of brand sales would be converted to the generic ($200 million * 0.8). As is also common, with only one generic on the market, the generic is typically priced at 90% of the brand, which would result in generic sales of approximately $144 million ($160 million * 0.9). Thus, the sales revenue during the 180-day exclusivity period that would reasonably have been anticipated by Par under the no-AG deal would be approximately $144 million.

110.    Par's expectations would have differed dramatically if Novartis had not promised to refrain from competing with its own AG. According to an FTC study of the dynamics of authorized generic entry during the 180 day generic exclusivity period, the addition of an AG drives the average generic price down to 52% of the brand price.[15] Thus, while the generics would still take 80% of brand sales, or $160 million, the generic sales value would drop to $83.2 million ($160 million * 0.52). And, it would reasonably be expected that those sales would be split evenly

---

[15] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011) at iii, available at https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

between Par and Novartis's authorized generic.[16] Thus, without the no-AG Agreement, Par's share of the revenue from sales of generic Exforge during the first 6 months would be expected to be approximately $41.6 million ($83.2 million * 0.5).

111.    As a result, the expected value at the time of the agreement to Par of having no-AG versus facing competition from an AG would have been at least approximately $102.4 million ($144 million - $41.6 million). Thus, Novartis's agreement to not launch an AG for 6 months was a payment to Par of $102.4 million or more. The value of this payment to Par was no different than if Novartis handed $102.4 million to Par in cash.[17]

112.    Novartis, which owns the generic company Sandoz, Inc., which often launches authorized generics, has a history of launching authorized generic versions of its own blockbuster branded products in the face of actual or impending competition from ANDA-based generics. The FTC has found that, in the time period from 2001 to 2008, which would encompass the Agreement, here, only three companies launched more authorized generics than Novartis:

---

[16] *Id.* at vi (The Federal Trade Commission has concluded that, when free from competition from an authorized generic, "the first-filer's revenue will approximately double" during the first six months of generic competition, compared to what the first filer would make if it faced authorized generic competition).

[17] The Federal Trade Commission has concluded that, when free from competition from an authorized generic, "the first-filer's revenue will approximately double" during the first six months of generic competition, compared to what the first filer would make if it faced authorized generic competition. *Id.* The Supreme Court has recognized this as well. *See Actavis*, 133 S. Ct. at 2229 (2013) (the "vast majority of potential profits for a generic drug manufacturer materialize during" the first six months of marketing).



See FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf, at p. 16 ("For each company, the graph includes all AGs marketed pursuant to the company's NDAs, whether marketed internally (e.g., by a subsidiary), or through an external generic partner.").

113.    On information and belief, Novartis has launched at least sixteen authorized generics between 2005 and 2016 including authorized generic versions of Exelon, Famvir, Focalin XR, Lescol XL, Lopressor HCT, Lotrel, Patanase, Patanol, Ritalin, Ritalin SR, Sandostatin,

Tegretol XR, Tobi, Tobradex, Trileptal, and VivelleDot.[18]

114.    It is economically rational for a brand manufacturer that intends to launch an AG to do so contemporaneously with the first ANDA filer's launch. The Supreme Court has observed that "the vast majority of potential profits for a generic drug manufacturer materialize during the 180-day exclusivity period." *Actavis*, 133 S. Ct. at 2229.

115.    Novartis would have launched an authorized generic version of Exforge upon market entry by Par in the absence of the anticompetitive Agreement here.

116.    Even with the most conservative estimates, the payment flowing from Novartis to Par via the Agreement not to compete with an authorized generic had a cash value in the hundreds of millions of dollars. The payment was to induce Par to stay out of the market for Exforge and its generic equivalents in return for sharing monopoly profits among Defendants, a naked market allocation and thus a *per se* violation of the Sherman Act. But even under the Rule of Reason, the payment is unexplained, and Defendants will have no pro-competitive justification or other legitimate explanation for the payment.

117.    Absent Novartis's unlawful payments to Par, any agreement settling Novartis's patent claims would have resulted in much less delay of Par's generic entry than with the payment. But for the Agreement, Par would have launched generic Exforge as early as September 21, 2012, but no later than March 29, 2013. Par would have launched, without a license from Novartis, on September 21, 2012, when the '578 Patent expired, because the '197 and '728 Patents were not a bar to Par's entry. This is evident by the fact that Mylan, N.V., ("Mylan"), Teva Pharmaceutical Industries, Ltd. ("Teva"), Torrent Pharms, Ltd. ("Torrent"), Novel Labs, Inc. ("Novel") and Lupin

---

[18] *See* FDA's Listing of Authorized Generics as of March 28, 2018, *available at:* http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/UCM183605.

Pharmaceuticals, Inc. ("Lupin") all launched on or about March 30, 2015, when Par's 180-day exclusivity expired. On information and belief, Mylan, Teva, Torrent, Novel, and Lupin launched without a license from Novartis, despite the fact that the '197 and '728 Patents had not yet expired. Novartis also would have launched its authorized generic upon Par's launch.

118.     Had Par launched its generic product as early as September 21, 2012, but no later than March 28, 2013, at least one subsequent filer would have obtained final FDA approval and launched its generic equivalent of Exforge immediately upon expiration of Par's 180-day exclusivity period.

119.     On information and belief, the primary reason why Par did not launch on September 21, 2012 when the '578 Patent expired was not because of infringement risk flowing from the '197 and '728 Patents. Rather, it was because both Par and Novartis leveraged the fact that Par, as the first ANDA filer, had 180 days of regulatory exclusivity during which no subsequent filer could launch an ANDA version of Exforge. Both Par and Novartis recognized that delaying Par's launch in exchange for a no-AG agreement would benefit both companies. Novartis would benefit by continuing to charge ever increasing monopoly prices for Exforge despite the fact that the '197 and '728 Patents were not barriers to generic entry. Par would benefit by (1) entering a market that Novartis grew during the period of delay by raising prices; and (2) securing a no-AG agreement to be free from competition for the first six months after its delayed launch.

120.     Alternatively, Par and Novartis would have entered into a license without a no-AG provision, that provided for no delay, or only nominal delay.

121.    According to information available publicly through the FDA, in addition to Par and Synthon, at least eight additional companies filed ANDAs to sell generic Exforge:

| Application No. | Company |
|---|---|
| 202713 | Alembic Pharms Ltd |
| 206512 | Aurobindo Pharma Ltd |
| 205137 | Invagen Pharms |
| 090245 | Lupin |
| 090483 | Mylan Pharms Inc. |
| 202829 | Novel Labs Inc |
| 091235 | Teva Pharms USA |
| 202377 | Torrent Pharms Ltd |

122.    According to information available publicly through the FDA, many of these entities received final approval on or around the end of Par's actual 180-day exclusivity of March 30, 2015.

123.    But for the Defendants' ongoing performance under the Agreement, generic competition for Exforge would have occurred earlier and prices for both branded and generic versions of Exforge would have been lower. But for Defendants' ongoing, illegal anticompetitive conduct, generic versions of Exforge would have become available as early as September 21, 2012, but no later than March 29, 2013. Plaintiff and other members of the Class would have paid lower prices for Exforge and its generic equivalents. Defendants, by their conduct, have injured Plaintiff and other members of the Class by causing them to pay millions of dollars in overcharges on their purchases of Exforge and its generic equivalents.

## CLAIM ACCRUAL AND/OR TOLLING

124.    Under the continuing tort precedent, the lawsuit is timely as a matter of law as to all overcharge sales since May 2014.

125.    Under the discovery rule, the lawsuit is timely as to all overcharge sales because Plaintiff's cause of action did not accrue as to those sales until after May 2014 (i.e., within the

statutory period).

126.    Even if Plaintiff's cause of action as to pre-May 2014 sales accrued prior to May 2014 notwithstanding the discovery rule, the running of the statutory period was suspended under the tolling doctrines.

127.    Many of the overcharges alleged herein occurred during the limitations period. To the extent some overcharges occurred prior to the four-year period of the filing of this Complaint, Plaintiff and members of the Class had no knowledge, or reason to know despite the exercise of reasonable diligence, of Defendants' unlawful scheme of Novartis's pledge to not launch an authorized generic, from the date of the consummation of the Agreement to Novartis's failure to launch an authorized generic version of Exforge.

128.    Defendants also engaged in efforts to conceal from Plaintiff the existence of its cause of action.

129.    Defendants efforts included concealing from Plaintiff any of the unlawful terms of the Agreement that could have put Plaintiff on notice that the Agreement would operate to preclude Novartis from launching an authorized generic for the first six months following Par's launch.

130.    Even when limited information about the Agreement was made available in SEC filings, the key illegal aspect of the Agreement was excluded. Specifically, while Novartis's 20-F for the fiscal year ending December 31, 2011 states "In the US, under a license agreement with a generics manufacturer, the product [Exforge] is expected to face generic competition beginning in October 2014,"[19] it does *not* state that the license agreement would operate to preclude Novartis from launching an authorized generic for the first six months following Par's launch.

---

[19]   Novartis's 20-F for the fiscal year ending December 31, 2011, at 153, available at https://www.novartis.com/sites/www.novartis.com/files/Novartis-20-F-2012.pdf.

131.    It was not until September 30, 2014, at the earliest, when Par's launch of its generic version of Exforge was not met with a contemporaneous launch of an authorized generic by Novartis (either directly or through a licensee), that Plaintiff could have suspected that the Agreement precluded an authorized generic for some period following Par's launch. Thus, no amount of diligence could have put Plaintiff on notice of its claim until September 30, 2014 at the earliest.

132.    Plaintiff regularly monitors industry information sources on generic launch timing as part of its business planning and inventory management practices.  Here, Plaintiff detected no suspicious conduct prior to Novartis's failure to launch an authorized generic upon Par's September 30, 2014 entry of generic Exforge.

133.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class's claims have been tolled.

134.    Alternatively, if the statute of limitations is not tolled, this Complaint alleges a continuing course of conduct (including conduct within the limitations period), and Plaintiff and the members of the Class can recover for damages that they suffered during the limitations period.

## ANTICOMPETITIVE EFFECT

135.    The Agreement has enabled the Defendants to: (a) prevent and delay the entry of less expensive generic versions of Exforge products in the United States, including its territories, possessions, and the Commonwealth of Puerto Rico; (b) fix, raise, maintain, or stabilize the price of Exforge products; and (c) allocate 100% of the U.S. market for Exforge and its generic equivalents to Novartis.

136.    The '578 Patent expired on March 21, 2012, and the attached pediatric exclusivity expired on September 21, 2012. Par launched its generic version of Exforge on September 30,

2014, and at least five later filing generics (Mylan, Teva, Torrent, Novel and Lupin) launched their generic versions on or shortly after March 31, 2015. Novartis launched an authorized generic of Exforge on or shortly after March 31, 2015 through its subsidiary, Sandoz.

137.    But for the continuing illegal agreements between Par and Novartis (which included financial inducements to delay the launch of a less expensive generic version of Exforge) Par would have begun selling a less expensive AB-rated generic version of Exforge as early as as early as September 21, 2012, but no later than March 29, 2013. Such sales would have occurred via market entry by Par upon Par's final FDA approval after expiry of the '578 Patent on September 21, 2012, or shortly thereafter under a license with Novartis that did not include a no-AG provision. In addition, upon market entry by Par, Novartis would have begun selling its own less expensive authorized generic version of Exforge in direct competition with the Par generic. Other ANDA-based generic versions of Exforge, including but not limited to the Mylan, Teva, Torrent, Novel and Lupin products, would have followed into the market as early as 180 days after the launch by Par.

138.    An increasingly competitive market for Exforge and its generic equivalents would have thereafter emerged as additional generic manufacturers entered the market.

139.    Defendants' unlawful concerted action has delayed or prevented the sale of generic Exforge in the United States, and unlawfully enabled Novartis to sell Exforge, and Par to sell its generic equivalent of Exforge, at artificially inflated, supra-competitive prices.

140.    Thus, Defendants' unlawful conduct deprived Plaintiff and the Class of the benefits of competition that the antitrust laws were designed to ensure.

## ANTITRUST IMPACT

141.    During  the  relevant  period,  Plaintiff  and  members  of  the  Class  purchased

substantial amounts of Exforge directly from Novartis and substantial amounts of generic equivalents of Exforge directly from Par. As a result of Defendants' illegal conduct, Plaintiff and members of the Class were compelled to pay, and did pay, artificially inflated prices for their requirements for fixed combination products comprising valsartan and amlodipine. Those prices were substantially greater than the prices that Plaintiff and members of the Class would have paid absent the illegal conduct alleged herein, because: (1) the price of Exforge was artificially inflated by Defendants' illegal conduct, and (2) Plaintiff and Class members were deprived of the opportunity to purchase lower-priced generic versions of Exforge, which they would have purchased had they had the opportunity. When generic versions of Exforge were finally available, prices of generic Exforge were higher than they would have been absent Defendants' illegal conduct, and so Plaintiff and the Class have incurred overcharges on their purchases of generic Exforge as well.

142.    As a consequence, Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

## EFFECT ON INTERSTATE COMMERCE

143.    At all material times, Novartis manufactured, promoted, distributed, and sold substantial amounts of Exforge in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States, including its territories, possessions, and the Commonwealth of Puerto Rico. During the relevant time period, in connection with the purchase and sale of Exforge, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

144.    During the relevant time period, various devices were used to effectuate the illegal

acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants as charged in this Complaint were within the flow of, and have substantially affected, interstate commerce.

## MONOPOLY POWER AND MARKET DEFINITION

145.    At all relevant times, Novartis has maintained monopoly power over the market for Exforge and its generic equivalents in that it has had the power to maintain the price of Exforge at supracompetitive levels without losing so many sales as to make the supracompetitive price unprofitable.

146.    Direct proof exists that Novartis has monopoly power over the price of fixed combination products comprising amlodipine and valsartan. Such direct evidence includes, among other things, the abnormally-high price-cost margins enjoyed by Novartis prior to entry of generic Exforge and Novartis's ability to profitably maintain the price of Exforge well above competitive levels.

147.    To the extent Plaintiff is legally required to prove monopoly power circumstantially by first defining a relevant product market, the only relevant market is Exforge (in all its forms and dosage strengths), and bioequivalent generic versions of Exforge. The relevant geographic market is the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

148.    Novartis's anticompetitive payment to Par demonstrates that Novartis enjoyed market and/or monopoly power with respect to Exforge (in all its forms and dosage strengths) and bioequivalent generic versions of Exforge.

149.    A small but significant non-transitory price increase above the competitive level for Exforge by Novartis would not cause a loss of sales sufficient to make the price increase

unprofitable.

150.    At competitive price levels, Exforge does not exhibit significant positive cross-price elasticity of demand with any product other than AB-rated generic versions of Exforge.

151.    During the relevant period, Defendants' anticompetitive conduct has significantly damaged competition and consumers through a reduction of output and higher prices caused by an elimination or reduction of lower cost generic Exforge throughout the United States, including its territories, possessions, and the Commonwealth of Puerto Rico.

152.    Other drugs that are not AB-rated to Exforge cannot be substituted automatically for Exforge by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to Exforge, and thus are not economic substitutes for, nor reasonably interchangeable with, Exforge.

153.    The existence of other products designed to treat hypertension or other illnesses treated by Exforge has not significantly constrained Novartis's pricing of Exforge. On information and belief, Novartis has never lowered the price of Exforge in response to the pricing of other branded or generic treatments.

154.    Novartis needed to control only Exforge and its AB-rated generic equivalents, and no other products, in order to maintain the price of Exforge profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Exforge would render Novartis unable to profitably maintain its prices of Exforge without losing substantial sales.

155.    Novartis, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

156.    Novartis has maintained and exercised the power to exclude and restrict

competition to Exforge and AB-rated generics.

157.     At all relevant times, Novartis's market share in the relevant market was 100%, implying substantial monopoly power.

**FIRST CAUSE OF ACTION**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(AGREEMENT NOT TO COMPETE – NOVARTIS AND PAR)**

158.     Plaintiff incorporates and realleges all paragraphs in this Complaint, as though fully set forth below.

159.     Novartis and Par, their agents and affiliates and co-conspirators, both known and unknown, entered into and engaged in a continuing unlawful trust and agreement in restraint of trade and commerce in Exforge and its generic equivalents, in violation of the Sherman Act by entering into agreements to extend patent monopolies and to divide markets and allocate customers.

160.     In or around 2011, Novartis and Par commenced a continuing illegal contract, combination and conspiracy in restraint of trade, the purpose and effect of which was to: (a) allocate all sales of fixed combination products comprising amlodipine and valsartan in the United States to Novartis; (b) prevent the sale of a generic version of Exforge in the United States until as late as September 30, 2014, and thereafter restrict the supply of generic versions of Exforge, thereby protecting Exforge from further generic competition; and (c) fix the price at which Plaintiff and the other members of the Class would pay for Exforge and its generic equivalents at a higher, supra-competitive price.

161.     By engaging in this unlawful and continuing conspiracy, Novartis and Par have unlawfully conspired in restraint of trade and committed a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In the alternative, Defendants' conduct is an unreasonable restraint of trade in violation of Section 1 when viewed under a "rule of reason" mode of analysis. Plaintiff

and the other members of the Class have been injured in their business and property by reason of Novartis and Par's unlawful contract, combination and conspiracy.

162.    Starting with the beginning of the Class Period, and continuing throughout the Class Period, Plaintiff and the other members of the Class have paid more on their purchases of Exforge and its generic equivalents than they would have paid absent Novartis's and Par's illegal conduct, and/or were prevented from substituting a cheaper generic alternative for their purchases of the more expensive branded and generic Exforge.

163.    But for the continuing illegal agreements between Novartis and Par (which included financial inducements to delay the launch of a less expensive generic version of Exforge), Par would have begun selling a less expensive AB-rated generic version of Exforge as early as September 21, 2012, but no later than March 29, 2013. Such sales would have occurred via market entry by Par upon Par's final FDA approval after expiry of the '578 patent on September 21, 2012, or shortly thereafter under a license with Novartis that did not include a no-AG provision. In addition, upon market entry by Par, Novartis would have begun selling its own less expensive authorized generic version of Exforge in direct competition with the Par generic.

164.    If manufacturers of generic Exforge entered the market and competed with Exforge in a full and timely fashion, Plaintiff and the other members of the Class would have substituted lower-priced generic versions of Exforge for the higher-priced brand-name Exforge for some or all of their requirements for fixed combination products comprised of valsartan and amlodipine, and/or would have paid lower prices on some or all of such purchases.

165.    During the relevant period, Plaintiff and the other Class members purchased substantial amounts of Exforge tablets directly from Novartis and/or their generic equivalents directly from Par. As a result of the Defendants' illegal conduct alleged herein, Plaintiff and the

other Class members were compelled to pay, and did pay, artificially inflated prices for their requirements for fixed combination products comprised of amlodipine and valsartan. Plaintiff and the other Class members paid prices for such products that were substantially greater than the prices they would have paid absent the illegal conduct alleged herein because: (1) Class members were deprived of the opportunity to purchase lower-priced generic versions of Exforge instead of expensive brand-name Exforge tablets; (2) Class members were forced to pay artificially inflated prices for Exforge and generic versions of Exforge; and/or (3) the price of brand-name Exforge was artificially inflated by Novartis's and Par's illegal conduct.

166.    There is, and was, no legitimate, non-pretextual procompetitive justification for Defendants' actions comprising the anticompetitive scheme that outweighs their harmful effect. Even if there were some conceivable such justification, the scheme is and was broader than necessary to achieve such a purpose.

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
## (MONOPOLIZATION AND MONOPOLISTIC SCHEME – NOVARTIS)

167.    Plaintiff incorporates and realleges all paragraphs in this Complaint, as though fully set forth below.

168.    Novartis used various willful and exclusionary means as part of a scheme described herein to improperly maintain and extend its monopoly power in the market for Exforge and its generic equivalents, as detailed above.

169.    The goal, purpose and/or effect of the scheme was to prevent, delay and/or minimize the success of the entry of generic competitors which would have sold generic versions of Exforge in the United States at prices significantly below Novartis's prices for branded Exforge, which would have effectively caused the average market price of fixed combination products comprising amlodipine and valsartan to decline dramatically.

170.    The goal, purpose and/or effect of Novartis's scheme was also to maintain and extend Novartis's monopoly power with respect to Exforge and its generic equivalents.

171.    But for Novartis's ongoing, illegal anticompetitive conduct, generic versions of Exforge would have become available as early as September 21, 2012, but no later than March 29, 2013. Plaintiff and other members of the Class would have paid lower prices for Exforge. Defendants, by their conduct, have injured Plaintiff and other members of the Class by causing them to pay hundreds of millions of dollars in overcharges on their purchases of Exforge.

172.    If manufacturers of generic versions of Exforge had entered the market and competed with Exforge in a full and timely fashion, Plaintiff and the other members of the Class would have substituted lower-priced generic versions of Exforge for the higher-priced brand-name Exforge for some or all of their requirements and/or would have paid lower prices for some or all of their remaining Exforge purchases.

173.    During the relevant period, the named Plaintiff and the other Class members have purchased substantial amounts of Exforge directly from Novartis and have purchased substantial amount of the generic version of Exforge from Par. As a result of Novartis's illegal conduct alleged herein, Plaintiff and the other members of the Class have been compelled to pay, and have paid, artificially inflated prices for their requirements for fixed combination products comprising amlodipine and valsartan. Plaintiff and the other members of the Class paid prices for such products that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Class members were deprived of the opportunity to purchase lower priced generic versions of Exforge instead of expensive brand-name Exforge, which Plaintiff and the Class would have purchased in place of branded Exforge had they had the opportunity; (2) Class members were or will be forced to pay artificially inflated prices for generic versions of

Exforge; and/or (3) the price of branded Exforge was artificially inflated by Novartis's illegal conduct. Novartis's scheme was in the aggregate an act of monopolization undertaken with the specific intent to monopolize the market for amlodipine and valsartan in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

### THIRD CAUSE OF ACTION
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### (ATTEMPT TO MONOPOLIZE - NOVARTIS)

174.    Plaintiff incorporates and realleges all paragraphs in this Complaint, as though fully set forth below.

175.    Novartis, through its anticompetitive scheme, specifically intended to maintain monopoly power in the relevant market. It was Novartis's conscious objective to control prices and/or to exclude competition in the relevant market.

176.    The natural and probable consequence of Novartis's anticompetitive scheme, which was intended by, and plainly foreseeable to, Novartis, was to control prices and exclude competition in the relevant market, to the extent that it did not succeed.

177.    There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Novartis would succeed in and achieve its goal of maintaining monopoly power in the relevant market. As a direct and proximate result of Novartis illegal and monopolistic conduct, Plaintiff suffered antitrust injury as alleged above.

### FOURTH CAUSE OF ACTION
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### (CONSPIRACY TO MONOPOLIZE – NOVARTIS AND PAR)

178.    Plaintiff incorporates and realleges all paragraphs in this Complaint, as though fully set forth below.

179.    Defendants Novartis and Par combined, conspired and contracted between and among themselves to unreasonably and unlawfully restrain and monopolize trade and to attempt

to monopolize trade with specific intent, and Novartis did, in fact, monopolize trade in the United States in the market for Exforge and its generic equivalents thereby eliminating competition in that market.

180.    Novartis and Par, their agents and affiliates and co-conspirators, both known and unknown, entered into and engaged in a continuing unlawful trust in restraint of trade and commerce in Exforge and its generic equivalents, in violation of the Sherman Act, by entering into agreements to extend patent monopolies and to divide markets and allocate customers.

181.    Novartis and Par each committed at least one overt act in furtherance of the conspiracy.

182.    The purpose and effect of such agreements was to fix, raise, stabilize and maintain the prices for Exforge and its generic equivalents at supra-competitive levels, which increased prices were paid by Plaintiff and the Class.

183.    During the Class Period, Plaintiff and the other members of the Class purchased substantial amounts of Exforge directly from Novartis, and purchased substantial amounts of generic versions of Exforge directly from Par. As a result of Defendants' illegal conduct, alleged herein, Plaintiff and the other members of the Class have been compelled to pay, and have paid, artificially inflated prices for their requirements for fixed combination products comprising amlodipine and valsartan. Plaintiff and the other members of the Class paid prices for such products that were substantially greater than the prices they would have paid absent the illegal conduct alleged herein because:  (1) Class members were deprived of the opportunity to purchase lower-priced generic versions of Exforge instead of expensive brand-name Exforge and would have purchased such lower-priced generic in place of branded Exforge had they had the opportunity; (2) Class members were or will be forced to pay artificially inflated prices for generic

versions of Exforge; and/or (3) the price of brand-name Exforge was artificially inflated by Novartis, Par and Synthon's illegal conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, prays for judgment against all Defendants, jointly and severally, as follows:

1. That the Court adjudge and decree that the Defendants and each of them have violated Sections 1 and 2 of the Sherman Antitrust Act;

2. That the Plaintiff and all others similarly situated be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with the law;

3. That the Plaintiff be awarded reasonable attorneys' fees and costs; and

4. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims and complaints in this Complaint so triable.

DATED: June 22, 2018

Respectfully submitted,

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Peter Kohn
Joseph T. Lukens
101 Greenwood Ave., Suite 600
Jenkintown, PA 19046
(215) 277-5770

**BERGER & MONTAGUE, P.C.**
David F. Sorensen
Caitlin G. Coslett
1622 Locust St.
Philadelphia, PA 19103
(215) 875-3000

*Attorneys for Plaintiff Rochester Drug Co-Operative, Inc.*

**FARUQI & FARUQI, LLP**

By: Kristyn Fields
Kristyn Fields (No. KF-4461)
685 Third Ave., Floor 26
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: kfields@faruqilaw.com

*Attorneys for Plaintiff Rochester Drug Co-Operative, Inc.*